IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPTO GENERIC DEVICES, INC., <br><br> Plaintiff/Counterclaim Defendant, <br><br> v. <br><br> AIR PRODUCTS AND CHEMICALS, INC., <br><br> Defendant/Counterclaim Plaintiff. | No. 6:08-cv-00234 (DNH-DEP) |

## AMENDED COUNTERCLAIM

Defendant/Counterclaim Plaintiff, Air Products and Chemicals, Inc. ("Air Products"), by and through its undersigned counsel, Scolaro, Shulman, Cohen, Fetter & Burstein, P.C., hereby files this Amended Counterclaim against Plaintiff/Counterclaim Defendant, Opto Generic Devices, Inc. ("OGD"), and states as follows:

THE AGREEMENT

1. The Joint Development Agreement ("Agreement") between Air Products and OGD concerned the development and licensing of certain technology, specifically the development of energy-saving devices which could be installed onto certain types of equipment, causing the equipment to operate in a more energy-efficient manner, as well as the licensing of certain patent rights.

2. The primary purpose of the Agreement was to enable the parties to participate in the Energy Management Market by selling additional energy capacity to utilities or independent system operators (ISO's). In order to accomplish this, Air Products needed verifiable data regarding the capabilities and efficiency of the energy-saving devices. Air

Products would then sell the devices to third parties for installation onto commercial equipment and market the demonstrable energy savings to public utilities or ISO's looking for additional capacity (whether through RFP's or capacity auctions).

3. At the time the Agreement was entered into, OGD had a baseline device (called the "ACC-1") which OGD marketed as having energy-saving capability. The Agreement required OGD to, among other things, conduct certain tests on, and perform certain modifications, adaptations, and/or improvements to, the ACC-1. Specifically, under Articles 3.1 and 3.3 of the Agreement, OGD was required to use its "best efforts" to "undertake the Development Project and to achieve the objectives" set forth in the Scope of Work and to "complete work under the Development Project within the time allocations presented" therein. At the earliest indication of any inability to complete any objective or milestone under the Development Project, OGD was required to notify Air Products.

4. The Scope of Work consisted of three projects, referred to as Project 1 ("P1"), Project 2 ("P2"), and Project 3 ("P3"). Each of the three projects comprising the Development Project carried with it associated objectives and milestones, as set forth in the Scope of Work, which was expressly incorporated by reference into the parties' Agreement.

5. Specifically, P1 required modification of the ACC-1 device to comply with European and Asian voltage requirements. P1 also required OGD to test and verify the energy saving capabilities of both the baseline ACC-1 device as well as the P1 device according to certain methodology published by ISO New England. P1 milestones included, among other things, deadlines for the development of agreed-upon engineering specifications for the P1 device, as well as deadlines for the completion of testing and verification.

6. P2 required further modification of the technology to enhance the

amperage rating of the P1 device to support 20-40 amp service suitable for single phase motors. P2 also required exploration and evaluation of advanced control techniques (such as variable speed applications, half speed applications, or fixed speed applications) to achieve a 10% to 20% energy efficiency improvement over the P1 device. P2 milestones included, among other things, deadlines for the development of agreed-upon engineering specifications for the P2 device, as well as deadlines for identifying the agreed-upon advanced control techniques to achieve improved energy savings.

7. P3 contemplated the development of a prototype device, which would incorporate OGD's existing optical programming encoder technology and have the capability to work with 480V, 40 amp, three-phrase motors used in industrial applications. P3 milestones included, among other things, deadlines for the identification of applicable motor applications and size ranges.

8. With regard to the objectives and milestones set forth in the Scope of Work, Article 3.2 of the Agreement required the parties to meet at least monthly "to review progress under the proposed goals, priorities, milestones and funding allocations" of the Development Project, and, when necessary, to "revise such goals, priorities, milestones and funding allocations in order to best accomplish the objectives of the Development Project."

OGD'S FAILURE TO MEET CONTRACTUAL OBJECTIVES AND MILESTONES

9. Since entering into the Agreement, OGD – almost immediately –failed to meet its contractual obligations, most notably the project objectives and milestones set forth in the Scope of Work.

10. Throughout the spring and summer of 2007, Air Products and its consultant, Mr. Thomas Yeh, repeatedly expressed concern, both orally and in writing, regarding OGD's lack of progress under the Agreement, as well as OGD's apparent distraction with

unrelated projects (such as OGD's development of a remote control device and a condensate collection system for hotel room air conditioners), which drained valuable resources away from the Development Project.

11. OGD's own president, Ormonde G. "Art" Durham, III ("Art Durham"), echoed and confirmed Air Products' concerns, when, on July 30, 2007, he lambasted his own staff of employees for their lack of effort and progress on the Development Project to date.

12. By mid-September, 2007, Air Products had paid OGD a sum of $900,000, but OGD had failed to demonstrate any discernible progress on the Development Project. Specifically, and by way of example only, OGD had failed to even propose (let alone reach agreement on) engineering specifications for either the P1 or P2 devices (due June 11, 2007 and July 2, 2007, respectively), and had failed to complete testing and data verification on the baseline ACC-1 device (due September 14, 2007). In addition to failing to meet the contractual milestones which had already passed by mid-September, 2007, OGD showed no indication that it would be capable in the future of meeting these past milestones or of meeting any of the remaining, future contractual objectives and milestones.

13. At or around this same time, Air Products' Paul Persico wrote to OGD and, pursuant to Article 3.2 of the Agreement, proposed certain revisions to the milestones and funding allocations set forth in the Agreement and Scope of Work. Mr. Persico's proposal included, among other things, a relaxation or extension of certain of the deadlines set forth in the Scope of Work, which OGD had already missed, with further payments being tied directly to OGD's achievement of those milestones.

14. Mr. Persico's proposal was never accepted by OGD, and OGD's failure to meet the objectives and milestones set forth in the Scope of Work persisted. Indeed, by late

September, 2007, OGD's inability to perform under the Agreement grew into a wholesale unwillingness to perform. By way of example, OGD and its representatives walked out of a September 19, 2007 progress meeting with Air Products without even so much as negotiating or discussing the proposed revisions to the milestones set forth in the Scope of Work.

### AIR PRODUCTS' FORMAL NOTICE OF MATERIAL BREACH AND OGD'S FAILURE TO CURE

15. On October 23, 2007, and after having already paid OGD $900,000 under the Agreement, Air Products followed up its previous warnings by sending formal, written notice to OGD, advising again that OGD was in material breach of its obligations under the Agreement. The October 23, 2007 letter also specifically advised OGD that it had thirty (30) days in which to cure its breaches.

16. By November 23, 2007, OGD still had not cured its breaches, and in fact remained hopelessly delinquent in meeting the objectives and milestones set forth in the Scope of Work. Specifically, and by way of example, OGD still had not proposed engineering specifications for either the P1 or P2 device, and had not completed the requisite testing and data verification.

17. On January 10, 2008 – nearly three months after Air Products' formal default letter –four Air Products representatives traveled to OGD's Van Hornsville, New York facility, at OGD's request, and met with OGD representatives to give OGD an opportunity to demonstrate that OGD had brought its performance under the Agreement current.

18. During and after the January 10, 2008 meeting, however, it became apparent that OGD still had not fulfilled even the most basic requirements of the Agreement, including engineering specifications defining the technology to be developed and the presentation of reliable and verifiable baseline data regarding the capabilities of either the

existing ACC-1 device or the P1 device.

19. To date, OGD has failed to cure its material breaches of the Agreement.

DISCOVERY OF OGD'S MATERIAL NONDISCLOSURE

20. In or around September 2007, Air Products learned through a third party of the existence of an ongoing lawsuit captioned *Opto Generic Devices, Inc. v. Olney*, No. 05-cv-0358 (N.D.N.Y.) (the "Olney Litigation"), which OGD had initiated more than two years before the execution of the Agreement.

21. The Olney Litigation centered around allegations that a former OGD employee, Andrew W. Olney, stole trade secret information from OGD and obtained U.S. Patent No. 7,204,429 (filed April 28, 204, published November 3, 2005, issued April 17, 2007) (the "'429 Patent") based on the information he stole.

22. The allegedly stolen information and the '429 Patent address the same technology that is the subject of the Agreement between OGD and Air Products, technology OGD represented and warranted to Air Products that it solely owned and the rights to which OGD licensed to Air Products under the Agreement.

23. OGD had never disclosed to Air Products that the ownership of the very technology it was licensing to Air Products was in dispute and the subject of pending litigation.

24. To the contrary, under Article 16.1 of the Agreement, OGD expressly warranted and represented that it was "the sole owner of the BACKGROUND PATENT RIGHTS" and that OGD had "the full right to grant to AIR PRODUCTS all licenses and commercial rights set forth in [the] Agreement."

25. If parties other than OGD owned the '429 Patent, then the ability to develop, produce, make, have made, use, offer to sell, sell, and import the technology that is the subject of the Agreement is materially compromised, and could defeat the very purpose for

which the parties entered into the Agreement.

DISCOVERY OF INVALIDITY AND UNENFORCEABILITY OF OGD'S PATENTS

26. In the spring of 2008, Air Products learned through a third party that at least two key pieces of OGD's intellectual property which were licensed to Air Products under the Agreement – namely the '429 Patent as well as the patent application bearing the Serial No. 10/867,404 (the "Application") – are invalid and/or unenforceable for one or more reasons.

27. Specifically, and by way of example only, with regard to the '429 Patent, upon information and belief, certain additional individuals should have been included in the list of inventors for this patent but were intentionally and fraudulently omitted first when it was originally filed with the United States Patent and Trademark Office ("USPTO") and then again when it was subsequently transferred to OGD in 2008. The '429 Patent is also invalid by being anticipated or rendered obvious by certain other of OGD's patents or patent applications.

28. Similarly, and by way of example only, with regard to the Application, upon information and belief, certain additional individuals should have been included in the list of inventors for this patent application but were intentionally and fraudulently omitted when it was filed with the USPTO.

COUNT I – BREACH OF CONTRACT

29. Air Products incorporates by reference its allegations from paragraphs 1 through 28 as if set forth at length herein.

30. The Agreement is a valid contract, supported by consideration.

31. The Agreement requires, among other things, that OGD use its best efforts to develop certain technology and meet certain objectives and milestones set forth in the Scope of Work.

32. OGD has failed to use its best efforts to achieve the objectives and

milestones set forth in the Scope of Work.

33. OGD has failed to meet the objectives and milestones set forth in the Scope of Work.

34. OGD is in material breach of the Agreement.

35. OGD has failed to cure its material breach of the Agreement.

36. As a proximate result of OGD's material breach, Air Products has suffered damage.

WHEREFORE, Air Products respectfully requests judgment in its favor and against OGD on Count I of the Amended Counterclaim in an amount in excess of $900,000, along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

## COUNT II – BREACH OF CONTRACT

37. Air Products incorporates by reference its allegations from paragraphs 1 through 36 as if set forth at length herein.

38. As part of the Agreement (Article 8), OGD granted to Air Products certain rights under OGD's existing technology, as well as the technology to be developed pursuant to the Agreement.

39. Under Article 16.1 of the Agreement, OGD expressly warranted and represented that it was "the sole owner of the Background Patent Rights" and that OGD had "the full right to grant to Air Products all licenses and commercial rights set forth in [the] Agreement."

40. OGD breached these express warranties and representations because OGD did not and does not have record ownership of the '429 Patent, which is directed to the technology that was to be developed and included within the Background Patent Rights and

Improvements that were licensed to Air Products pursuant to the Agreement.

41. OGD is in material breach of the Agreement.

42. OGD has failed to cure its material breach of the Agreement.

43. As a proximate result of OGD's material breach, Air Products has suffered damage.

WHEREFORE, Air Products respectfully requests judgment in its favor and against OGD on Count II of the Amended Counterclaim in an amount in excess of $900,000, along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

COUNT III – BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

44. Air Products incorporates by reference its allegations from paragraphs 1 through 43 as if set forth at length herein.

45. The parties' Agreement contains within it the implied duty of good faith and fair dealing.

46. OGD violated the implied duty of good faith and fair dealing by, among other things, (1) failing to disclose that the ownership of the very technology it agreed to license to Air Products pursuant to the Agreement was in dispute, and in fact was being actively litigated; (2) failing to disclose that the '429 Patent and the Application were invalid and/or unenforceable.

47. As a proximate result of OGD's breach of the implied duty of good faith and fair dealing, Air Products has suffered damage.

WHEREFORE, Air Products respectfully requests judgment in its favor and against OGD on Count III of the Amended Counterclaim in an amount in excess of $900,000,

along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

## COUNT IV – DECLARATORY JUDGMENT

48. Air Products incorporates by reference its allegations from paragraphs 1 through 47 as if set forth at length herein.

49. Under Article 4.1 of the Agreement, Air Products agreed to pay $400,000 in exchange for certain license rights, as set forth in Article 8 of the Agreement.

50. Air Products paid OGD the aforementioned $400,000, plus an additional $500,000.

51. Air Products is entitled to a declaratory judgment that it in fact owns the license rights set forth in Article 8 of the Agreement.

WHEREFORE, Air Products respectfully requests declaratory judgment in its favor and against OGD on Count IV of the Amended Counterclaim, along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

## COUNT V – FRAUDULENT INDUCEMENT/FRAUDULENT NONDISCLOSURE

52. Air Products incorporates by reference its allegations from paragraphs 1 through 51 as if set forth at length herein.

53. During the parties' negotiation leading up to the Agreement, OGD and its president, Art Durham, knew that the ownership of the '429 Patent – which is directed to the very technology that was to be developed and licensed to Air Products pursuant to the Agreement – was in dispute and being actively litigated, and that OGD was not the record owner of the '429 Patent, but did not disclose these material facts to Air Products.

54. At this same time, OGD and its president, Art Durham, also knew that

both the '429 Patent and the Application were invalid and/or unenforceable due to, among other things, the intentional and fraudulent omission of certain individuals from the list of inventors.

55. OGD and Art Durham fraudulently omitted these material facts in an effort to induce Air Products to enter into the Agreement.

56. OGD's ownership of and rights to the existing technology upon which the Development Project would be based were material to Air Products' decision to enter into the Agreement with OGD. If OGD does not own the baseline technology, including Background Patent Rights, it cannot grant licenses – let alone exclusive licenses – under that technology to Air Products. Moreover, any devices developed under their Agreement would risk infringement of a third-party patent, precluding commercialization of the devices.

57. Air Products justifiably relied upon OGD's and Art Durham's representations and omissions of material fact, and had no reason to doubt that OGD owned the baseline technology or that OGD's patents or patent applications with respect to the baseline technology were valid and enforceable.

58. As a proximate result of OGD's and Art Durham's fraudulent nondisclosure, Air Products has suffered damage.

59. OGD's and Art Durham's fraudulent nondisclosure of material facts was willful, wanton, and outrageous.

WHEREFORE, Air Products respectfully requests judgment in its favor and against OGD on Count V of the Amended Counterclaim, and seeks the remedy of rescission of the Agreement, compensatory and consequential damages in an amount to be determined, along with an award of costs, attorneys' fees to the extent permitted by law, punitive damages, and such other relief as the Court deems proper.

## COUNT VI – DECLARATORY JUDGMENT

60. Air Products incorporates by reference its allegations from paragraphs 1 through 59 as if set forth at length herein.

61. The '429 Patent is invalid under 35 U.S.C. § 101 *et seq.* for failure to meet one or more of the statutory requirements for patentability and enforceability as set forth in Title 35 of the United States Code, including, but not limited to, the fraudulent omission as to inventorship and by being anticipated or rendered obvious by certain other of OGD's patents or patent applications.

62. The '429 Patent is unenforceable due to, among other things, the fraud perpetrated upon the USPTO by Art Durham by intentionally and fraudulently failing to list the proper inventors.

WHEREFORE, Air Products respectfully requests judgment in its favor and against OGD on Count VI of the Amended Counterclaim, along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

## COUNT VII – DECLARATORY JUDGMENT

63. Air Products incorporates by reference its allegations from paragraphs 1 through 62 as if set forth at length herein.

64. The Application is invalid under 35 U.S.C. § 101 *et seq.* for failure to meet one or more of the statutory requirements for patentability as set forth in Title 35 of the United States Code, including, but not limited to, the fraudulent omission as to inventorship.

65. The Application is unenforceable due to, among other things, the fraud perpetrated upon the USPTO by Art Durham by intentionally and fraudulently failing to list the proper inventors.

WHEREFORE, Air Products respectfully requests judgment in its favor and

against OGD on Count VII of the Amended Counterclaim, along with an award of costs, attorneys' fees to the extent permitted by law, and such other relief as the Court deems proper.

Dated: Respectfully submitted,

\_\_\_\_\_
Chaim J. Jaffe
SCOLARO, SHULMAN, COHEN, FETTER &
BURSTEIN, P.C.
Franklin Square
507 Plum St., Suite 300
Syracuse, NY 13204
(315) 471-8111

Of Counsel:

Kevin R. Casey
Stuart D. Lurie
STRADLEY RONON STEVENS & YOUNG, LLP
30 Valley Stream Parkway
Malvern, PA 19355
(610) 640-5800

*Attorneys for Defendant/Counterclaim Plaintiff,
Air Products and Chemicals, Inc.*