UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

OPTO GENERIC DEVICES, INC.

Plaintiff,

-v- 6:08-CV-234

AIR PRODUCTS & CHEMICALS, INCORPORATED;

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES: OF COUNSEL:

SCARZAFAVA & BASDEKIS, LLP
Attorneys for Plaintiff
48 Dietz Street, Suite C
Oneonta, NY 13820-5107

JOHN SCARZAFAVA, ESQ.
THEODOROS BASDEKIS, ESQ.

STRADLEY RONON STEVENS & YOUNG, LLP
Attorneys for Defendant
30 Valley Stream Parkway
Malvern, PA 19355

KEITH R. CUTILL, ESQ.
KEVIN R. CASEY, ESQ.
STUART D. LURIE, ESQ.

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

Defendant Air Products & Chemicals, Incorporated ("Air Products") moved for partial summary judgment as to plaintiff Opto Generic Devices, Inc.'s ("OGD") claim for consequential damages. Plaintiff opposed and defendant replied. Oral argument was heard April 23, 2009, in Utica, New York. Decision was reserved.

Air Products subsequently filed a motion to preclude the expert testimony of Lawrence D. Copp ("Copp"). Any hearing regarding this motion was held in abeyance pending resolution of the motion for partial summary judgment.

## II. BACKGROUND

The following facts are undisputed unless otherwise noted.

In April 2007, OGD entered into a contract with Air Products relating to OGD's development of energy-saving devices designed to be installed on certain equipment, such as air conditioners. The devices would cause the equipment on which it was installed to consume less peak power and operate in a more energy-efficient manner. Further, OGD would license related patent rights to Air Products. When the contract was executed OGD marketed its baseline motor-controlling device, the "ACC-1" adaptive climate controller, as having energy saving capability. According to OGD, the two objectives of the contract were to (1) expand OGD's marketing of the ACC-1; and (2) develop new products that would be upgrades of the ACC-1.

Under the contract, OGD would test and modify the ACC-1 using its best efforts to develop the three new variations of the ACC-1, designated by the parties as "sub-projects." Sub-project 1 ("P1") called for modification of the ACC-1 technology so that it could be used with European and Asian voltage requirements. Sub-project 2 ("P2") was to modify the P1 device to be suitable for operating all single phase power drivers. Sub-project 3 ("P3") contemplated development of a licensed product using adaptive controller technology for industrial applications using 480V, 40 am, 3 phase power drivers. Completed development of the projects would result in three new products having international application to larger and more powerful motors.

Under the contract, Air Products was to pay OGD a total of two million dollars ($2,000,000). Air Products paid OGD an immediate payment of $400,000 as consideration for certain commercial rights and licenses to sell P1 (non-exclusive license), P2 (exclusive license), and P3 (exclusive license only as to Air Products' facilities), as set forth in Article 8 of the contract. (Am. Compl. Ex. A Art. 4, Doc. No. 32.) Thus, the initial $400,000 payment was for license rights. Id. § 4.1. The remaining $1.6 million was to be paid for the development work (of technology that would be jointly owned by OGD and Air Products) consisting of eleven monthly progress payments. Id. § 4.2. Air Products made the following progress payments as called for in the contract: May 2007 $200,000; June 2007 $100,000; July 2007 $100,000; and August 2007 $100,000 for a total of $900,000. Air Products made no additional payments.

With respect to P1, Article 8 of the contract provided that the non-exclusive license would survive completion or termination of the contract if Air Products purchased at least 10,000 "licensed products" during the respective annual periods beginning April 1, 2009. Id. § 8.1.1. "Licensed product" is defined as a variable speed control apparatus designed to control the speed of specified alternating current motors, including components of such devices. Id. § 2.20. Article 8 provided for Air Products' purchase of licensed products at a discount purchase price during the time when it retained the non-exclusive license. Id. § 8.1.2. Article 8 also provided that if OGD was unwilling or unable to supply Air Products' requirements, then Air Products would have a royalty-bearing license to make or have made the licensed products. Id. § 8.1.4. Similar contract provisions apply with respect to P2 and

P3 except that if the annual purchases during the specified periods are less than 10,000 the license reverts to a non-exclusive license.[1] Id. § 8.2-8.3

A Scope of Work incorporated into the contract set objectives and milestones for each of the sub-projects. Id. First Attachment Scope of Work April 10, 2007-Rev.2 (hereinafter "First Scope of Work"). A revised Scope of Work was executed by both parties in June 2007. Id. Ex. B First Attachment Scope of Work June 1, 2007-Rev. 5 (hereinafter "Second Scope of Work"). According to Air Products, one of the modifications was to remove marketing activities from the scope of the project regarding to P1. OGD disagrees and contends that the revision merely added details to the existing agreement, while keeping the original requirement that Air Products market all OGD's adaptive climate controller products (including ACC-1).

The contract permitted Air Products to visit OGD to review development accomplishments as well as provide guidance and technical assistance. Id. § 3.4. It also permitted Air Products to select personnel and consultants, subject to OGD's approval, to observe development work being done by OGD. Id. § 3.5.

## III. STANDARD

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505,

[1] There are additional provisions related to the commercial rights and licenses of the parties regarding P1, P2, and P3. See id. Art. 8. However, these additional provisions are irrelevant to the issues on these motions.

2509-10 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

When the moving party has met the burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. At that point, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

## IV. DISCUSSION

### A. Defendant's Motion for Partial Summary Judgment

Air Products contends that it had no duty under the contract to purchase products from OGD. Rather, according to Air Products, it was a development, not sales, contract. Thus, since there was no duty to make purchases under the contract, it cannot be liable for any lost profits due to it not making purchases. Further, Air Products contends that the consequences for both parties set forth in the contract demonstrate that the parties anticipated that Air Products may not purchase products from OGD. As stated by Air Products, "If Air Products bought a specified quantity of product, its license rights were

maintained or expanded. If, on the other hand, Air Products elected not to buy products, then its license rights were diminished or eliminated." (Deft.'s Mem. at 2, Doc. 59-15.) OGD argues the opposite--that the contract expressly requires marketing efforts--and that there also is an implicit obligation to promote its goods.

"The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties intent." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (N.Y. 2002). The written contract is the best evidence of the parties' agreement. Id. "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Id. The intent of the parties may be determined by turning to extrinsic evidence only where the contract is ambiguous. Id. A determination of whether the contract is ambiguous "is an issue of law for the courts to decide." Id. Where the contract "on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." Id. at 569-70. An ambiguity cannot be created by the interposition of some alternate interpretation by a party. Red Ball Interior Demolition Corp. v. Palmadessa, 173 F.3d 481,484 (2d Cir. 1999). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Id. Moreover, the contract must be read "as a whole to ensure that excessive emphasis is not placed upon particular words or phrases." South Rd. Assocs., LLC v. Int'l Bus. Mach. Corp., 4 N.Y.3d 272, 277 (N.Y. 2005).

Initially the contract between OGD and Air Products states that it is being entered into "to define terms and conditions under which OGD shall conduct development activities

pursuant to the terms" of the contract. (Am. Compl. Ex. A § 1.4.) The contract contains no such stated purpose as to any marketing or sales by Air Products.

The contract comprehensively delineates the parties' obligations with regard to patent prosecution and maintenance in Article 7 and commercial rights and licenses in Article 8. Id. Art. 7, 8. With regard to the licenses granted to Air Products, the contract provides that if Air Products purchases 10,000 products from OGD in a certain annual period, the licenses will continue. Id. §§ 8.1.1, 8.2.1. Conversely, if Air Products fails to purchase 10,000 products in the specified period, its license rights are diminished. Id. §§ 8.1.1 (P1 license rights terminate), 8.2.1 (P2 license rights revert from exclusive to non-exclusive). Further, the contract sets forth Air Products' obligations to make specified payments with regard its use of P3. Id. § 8.3. There is no provision requiring Air Products to purchase set amount, or any amount at all, of OGD's products.

The First Scope of Work attached to the contract at execution made statements regarding each of the three contemplated projects: (1) P1--"Modify and upgrade . . . ."; (2) P2--Upgrade modified ACC A-1 device . . . ."; and (3) P3--"Develop a prototype unit . . . ." Similar wording is included in the separate milestones, such as "upgrade," "testing," "analysis," and "documentation and patent preparation." Id. First Scope of Work. There is nothing in the descriptors of the work to be done related to Air Products purchasing products from OGD.

The Second Scope of Work provides more detail about the projects including objectives and milestones. Again, the descriptors of the work to be done provide no indication whatsoever about Air Products purchase of OGD products.[2]

OGD contends that the phrase "expand current marketing support and efforts" under the first project in the First Scope of Work indicates an obligation on the part of Air Products to vigorously market and sell OGD's products. As just noted, all of the objectives and milestones on the scopes of work are things that OGD is obligated to do with respect the to development of the contemplated products. None relate to Air Products obligations. If the parties had intended "expanding marketing support and efforts" to be an obligations of Air Products, the would have so stated as they did in other sections of the contract. Even if this meant Air Products was to expand marketing and support for OGD's current products, it would not support a reading that Air Products was required to purchase a set amount of products from OGD, especially given that P1, the subject of that paragraph of the First Scope of Work, was not even developed yet.

Moreover, the Second Scope of Work, entered into on June 1, 2007, as contemplated by the parties, did not include the "expanding marketing support and efforts" provision. Contrary to OGD's arguments, the contract clearly and unambiguously states that the Second Scope of Work "shall replace" the First Scope of Work. Id. § 3.1. Thus, the scopes of work provide no basis for OGD's lost profits relief.

[2] Following are paraphrased examples of the Second Scope of Work wording: "deliver a version," "quantify energy efficiency performance," "enhance the amperage," and "explore and evaluate control techniques." Id. Second Scope of Work.

OGD also argues that there is an implied obligation for Air Products to exploit the commercial licenses and to do otherwise would breach the implied covenant of good faith and fair dealing. The contract unambiguously provides that "there are no other agreements or understandings, express or implied, written or oral, as to the subject matter hereof." Id. § 17.1. Thus, the clear and unambiguous terms of the contract defeat this argument.

Reading the contract as a whole, the clear and unambiguous language reflects the parties' intent that this be a contract for development of P1, P2, and P3 products. It is not a contract for the sale of ACC-1 or any of the new projects in development.[3] That being the case, OGD is not entitled to damages for profits lost because of Air Products' failure to purchase its products.

### B. Defendants' Motion to Exclude OGD's Expert Lawrence D. Copp

OGD proffers the expert testimony of Lawrence D. Copp to opine about the amount of future lost profits damages to which it is entitled for the alleged breach of contract. Based upon the foregoing determination that OGD cannot recover lost profits damages under the contract, this expert testimony is irrelevant.

## V. CONCLUSION

The parties' contract is clear and unambiguous. It is a development contract, not a sales contract. Thus, plaintiff cannot recover for lost profits caused by Air Products' failure to purchase its products. Moreover, because plaintiff cannot recover lost profits damages, its proffer of expert testimony as to the amount of such damages is moot.

[3] Because it is found that the parties' contract, according to its unambiguous terms, was not one for the sale of goods, OGD's arguments pursuant to statutory duties under the Uniform Commercial Code necessarily fail.

Accordingly,

1. Defendant's motion for partial summary judgment is GRANTED;

2. Plaintiff's claim for lost profits damages is DISMISSED;

3. Defendant's motion to preclude the testimony of Lawrence D. Copp is GRANTED.

IT IS SO ORDERED.

United States District Judge

Dated: February 2, 2010
Utica, New York.